# O.

## Case No. 10,390.
### OAKES v. RICHARDSON.
[2 Lowell. 173.] [1]

District Court, D. Massachusetts. 1872.

ADMIRALTY — JURISDICTION — PERSONAL ACTION AGAINST OWNER—FAILURE TO PROCEED TO PORT OF LOADING—ACTION IN REM—DAMAGES—LOSS OF PROFIT—INTEREST.

1. The admiralty has jurisdiction of a personal action by a charterer against the owner of a vessel for damages, in not proceeding to the port of loading.

[Cited in Scott v. The Ira Chaffee, 2 Fed. 407; The Monte A., 12 Fed. 336; Paterson v. Dakin, 31 Fed. 684.]

2. The jurisdiction does not depend upon the fact of the cargo, or some part of it, having been put on board the vessel.

[Cited in Scott v. The Ira Chaffee, 2 Fed. 405, 407; The J. F Warner, 22 Fed. 345.]

3. It seems an action in rem would lie in such a case.

[Disapproved in Scott v. The Ira Chaffee. 2 Fed. 405; The Monte A., 12 Fed. 336. Cited in Paterson v. Dakin, 31 Fed. 684.]

4. The measure of damages in such an action is, usually. the increased freight and charges, if any, which the charterer has been obliged to pay in order to have his goods carried.

[Cited in The J. C. Stevenson, 17 Fed. 545.]

5. The cases in which loss of profit on the goods have been allowed in damages are exceptional.

[Cited in The Caledonia. 43 Fed. 686; Wheelwright v. Walsh. 44 Fed. 382.]

6. Interest allowed from the date of demand, upon evidence that the delay in proceeding was granted at the defendant's request.

Affreightment. The libel propounded that [James] Oakes and [Thaddeus] Richardson entered into a charter-party at Boston 19th September, 1868, by which the latter, as part owner and agent of the brig Goodwin, then on a voyage to Lisbon, chartered her to the libellant for a voyage from Cadiz, in Spain, to Gloucester or Boston, Massachusetts. to carry a full cargo of salt, in bulk, at a freight of seventeen cents for each bushel, measured out at the port of delivery; that he covenanted to receive the cargo on board, and safely deliver it, &c.; and that the parties bound themselves to each other in the penal sum of $3,000; that the defendant had broken his covenants, the vessel never having begun the voyage; and the libellant demanded the penalty. A copy of the charter-party was annexed to the libel. It contained this stipulation: "It is also agreed that the funds of the brig shall be used to pay for the cargo at Cadiz, and that, on the receipt of the invoice, Mr. Oakes shall pay the same in United States currency, with an additional amount sufficient to convert the same into American gold coin." He was also to pay interest, in-

[1] [Reported by Hon. John Lowell. LL. D., District Judge, and here reprinted by permission.]

surance, and wharfage. The answer admitted the execution of the charter-party. It denied the jurisdiction of the court, and alleged that, after the contract was made, the parties agreed that if the master of the brig should not assent to the charter-party, it was to be void, and that the master did not assent; that the libellant did not provide a cargo at Cadiz, and did not furnish the master with funds, except by directing him to draw on the libellant, which he was not bound to do; and that the brig had no funds. It denied all damage. There was evidence tending to show that the libellant had been in the salt trade with Cadiz for above forty years, and had a correspondent there who had agreed to furnish a cargo for this voyage at a certain price; that the libellant wrote to the master at Lisbon, communicating the terms of the charter, and directing him, in case the funds of the brig were insufficient, to draw on the libellant for the balance. One of the parties sent the charter-party to the master at Lisbon. In his deposition, in answer to a question, what he did about the charter-party, he said: "Well, I weighed the contents in my mind, in the first place. I abandoned it. I would not accept of it. I notified Mr. Thaddeus Richardson to that effect soon after I received the charter-party, perhaps a week after." The respondent received such a letter from the master, and notified the libellant, in writing, that the master declined to accept the charter. The parties afterwards met, and the respondent testified that he told the libellant, that, if it was a great disappointment, he would try to obtain him another vessel. An agent of the respondent testified to a similar conversation; and they both said that the answer of the libellant was, that he cared nothing about it. The libellant denied having had any such conversation with either witness. The libellant's evidence on the subject of damages tended to show that the season for selling salt of this kind was through the winter and early spring. before the fishermen began their voyages; that, if he had had this cargo at any time during the season of 1868–69, he should have made a profit of about $1.25 on each hogshead; that vessels were difficult to obtain for this business; and that he tried to charter them, not only to bring this cargo, but for his trade generally, and succeeded in obtaining only one ship, for which he paid a freight of twenty-five cents a bushel. It was agreed that the carrying capacity of the brig Goodwin was one-thousand eight hundred and forty-seven hogsheads, or fourteen thousand seven hundred and seventy-six bushels of salt.

S. Wells, for respondent. (1) The admiralty has no jurisdiction of a contract of affreightment, unless the goods have been ac-

tually shipped. Rich v. Parrott [Case No. 11,-760]; Clarke v. Crabtree [Id. 2,847]; Cutler v. Rae, 7 How. [48 U. S.] 729; The Tribune [Case No. 14,171]. (2) The agreement to furnish funds was conditioned on the brig's having them; and the libellant should have been prepared to furnish them in the contingency which happened. He could not require the master to become responsible as drawer of a bill. (3) The measure of damages is the difference in freight which the libellant would be obliged to pay to bring his salt to Gloucester or Boston, as to which there is no sufficient evidence.

J. C. Dodge, for libellant. (1) At the present day, there can be no doubt of the jurisdiction of the district court in admiralty over damages for breach of a charter-party. The doubts that were expressed at one time have all been done away by the late decisions. (2) The stipulation that the brig should furnish funds was not conditional, but an absolute engagement that there should be funds forthcoming; and the libellant was not bound to do even as much as he did in authorizing a draft. (3) The damages would often be the difference in freight; but, when other vessels cannot be obtained, it is the profit that might have been made on the goods. Sedg. Dam. (2d Ed.) 355–357; Brackett v. McNair, 14 Johns. 170; Amory v. McGreggor, 15 Johns. 24; O'Conner v. Forster. 10 Watts, 418; Bell v. Cunningham, 3 Pet. [28 U. S.] 69; Arthur v. The Cassius [Case No. 564].

LOWELL, District Judge. Since the decision in New Jersey S. N. Co. v. Merchants' Bank, 6 How. [47 U. S.] 344, it has not been doubted that the courts of admiralty of the United States have jurisdiction of a contract of affreightment; and this is now true of all voyages on the Great Lakes and other navigable waters of the country, as well as on the high seas. The Belfast, 7 Wall. [74 U. S.] 624; The Eddy, 5 Wall. [72 U. S.] 481; The Harriman, 9 Wall. [76 U. S.] 161. The respondent contends that the jurisdiction does not attach until the goods have been shipped. The opinion in Rich v. Parrott, which he cites, contains no more than the intimation of a doubt created by some then recent remarks in The Freeman v. Buckingham, 18 How. [59 U. S.] 182, and Vandewater v. Mills, 19 How. [60 U. S.] 82. In the former of these cases, there is a dictum (page 188) that the law creates no lien on a vessel as security for the performance of a contract to deliver cargo, until some lawful contract of affreightment is made, and a cargo is shipped under it. And, in the latter case, that remark is quoted and called a decision of the court; and a like rule concerning the privilege against vessels is cited from Boulay-Paty, 19 How. [60 U. S.] 91. But I do not understand the point to be decided in either of those cases; because, in the one, the controlling consideration was that no valid contract of affreight-

ment had been made, the master having signed a bill of lading for goods that had never been put on board his vessel, a fact which went quite beyond any question of lien; and in the other case, the contract was held to be one of partnership, and not of affreightment, and for that reason to be out of the sphere of the admiralty.

In a case which was ably argued and carefully considered, Mr. Justice Nelson, enforced a lien against a steamer for breach of a contract with a passenger, though the voyage had not been begun, and the libellant had not actually gone on board before suit brought. The Pacific [Case No. 10,643]. So did Judge Betts in respect to precisely such a contract and such a breach as are now in judgment, excepting that the proposed voyage was only from New York to Brooklyn. The Flash [Id. 4,857]. After stating the general rule, that the ship is bound by such an undertaking, the learned judge proceeds: "This principle does not require, as was contended by the counsel upon the argument, that the goods should be actually on board the vessel to raise the lien." And he gives some sound reasons for this opinion.

No doubt, liens or privileges in the admiralty may often exist when the law of agency would not hold the principal to be bound. The master can impress liens on the vessel by acts and neglects which do not bind the owners; as where he is appointed by a special owner, or even where he is not lawfully master at all. There may be cases in which a vessel will be bound for salvage, collision, bottomry, and, I think, for many other things, in which no person excepting the master can be sued in any court; and it follows from this, that, until some service has been begun, there will be no privilege against the vessel under such circumstances. But this case, being a personal one, does not raise any question of lien. The notion that the admiralty has no jurisdiction independently of lien, no power to give damages in a personal action for breach of a maritime contract, has been long since exploded in this country. The case, The Tribune [supra], contains only a reference to Andrews v. Essex F. & M. Ins. Co. [Case No. 374], in which it was held that a mere preliminary contract, looking to a maritime contract, is not itself maritime and cognizable in the admiralty; as, for instance, an agreement to give a policy of insurance in a certain form. In other words, a court of admiralty, though it acts on equitable principles, has not the power of a court of equity to enforce specific performance. When the agreements are executory in that sense, as being incomplete, this court cannot deal with them; but when the contract has been fully made, and is a maritime contract, it has not been held in this country, within the last twenty-five years, that the only remedy for a breach of it is in a court of common law. That the admiralty has jurisdiction of charter-parties, and that it may give a remedy for a breach

of such contracts, are identical propositions.

I do not find that this contract was to be void if the master refused to accept it. Some admissions of the libellant were testified to; but they are opposed to the charter-party itself, and cannot be received to control it. Nor do I consider it proved that the respondent offered to find another vessel as a substitute for the brig; and that the libellant, understanding the offer, refused it. The libellant denies it; and the conduct of the parties confirms the denial. If such an offer was made and refused, it is very doubtful whether it would estop the libellant from recovering damages. Higginson v. Weld, 14 Gray, 165. It is plain that the respondent had no other vessel to offer; and whatever was said can hardly have amounted to more than some suggestion or proposition of an equivocal character, that made no impression on the libellant's mind.

Upon the true measure of damages, the difference between the parties is rather of fact than law. This is not an action for misfeasance or delay in transporting a cargo, or damages for its loss. In such cases, where a carrier has once taken possession of the goods, he may often be liable for the net market price, at the port of delivery, at the time when the goods would have arrived but for the fault of the carrier; or for a diminution in market value. Cutting v. Grand Trunk Ry., 13 Allen, 381; The Boston [Case No. 1,671]. But the damages for refusing to receive a cargo are the necessary expenses to which the refusal has subjected the shipper, which are usually the increased rate of freight, if any, and often some incidental charges. The Tribune [Id. 14,171]; The Zenobia [Id. 18,209]; Crouch v. Great Northern Ry. Co., 11 Exch. 742; Ogden v. Marshall, 4 Seld. (8 N. Y.) 340; Porter v. The New England No. 2, 17 Mo. 290. The cases cited by the libellant hold that, if it is impossible to obtain other carriage for the goods, the loss of a probable profit may be recovered; but they are exceptional, and are so explained by Grier, J., in charging the jury in the suit in 10 Watts. Therefore, I say the parties differ only on the question of fact whether other vessels could have been obtained to bring this cargo. It appears that the libellant did charter one vessel during the season, and that he made some effort to charter others. This is all that is proved with any degree of definiteness. It seems probable that ship-brokers might have given further information as to the state of the market for freights. It appeared incidentally from one of the defendant's witnesses that ships were difficult to obtain at that time; and there was evidence that some vessels had been chartered during the season, but before the breach of this contract, for sixteen cents, and so on up to seventeen cents, a bushel. After the breach, it was the duty of the charterer, if he wished to claim damages of the respondent, to obtain a freight as low as he reasonably might; and, whether he made any such exertions or not, the damages would be measured by what he might have done in that respect. I do not doubt that Mr. Oakes chartered the ship in December as low as he could; but whether, in November, he could have done any better, or whether there may have been other vessels at any time during the season ready to serve at more reasonable rates, I do not know. Taking the evidence as given, I must award the difference between seventeen and twenty-five cents a bushel. When the damages are unliquidated, whether the form of the action be tort or contract, the allowance of interest is within the discretion of the court or jury. Here the libellant in June, 1869, made a demand on the respondent for damages at one dollar per hogshead, though he considered the loss to be more than that. The preponderance of testimony seems to me to be, that the delay in prosecuting the case, after this bill was rendered, was occasioned by a request of the respondent that the libellant would wait until the brig should come to Massachusetts; so that the damages, if any, should fall equally on all interests, without raising any question of contribution, or requiring another action between the owners themselves. Under these circumstances, it seems to be just that interest should be charged from a reasonable time after the demand. I accordingly award to the libellant damages for the breach of the charter-party, as follows: Cost of freight beyond that agreed on, 14,776 bushels at 8 cents, $1,182.08; interest three years and four months, $236.41,—$1,418.49, and costs of suit.